Filed 7/21/16  Scurich Brothers, Inc. v. Frederickson CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| SCURICH BROTHERS, INC. et al., | H038675 |
| Plaintiffs and Respondents, | (Monterey County Super. Ct. No. M90957) |
| v. | |
| MARK FREDERICKSON et al., | |
| Defendants and Appellants. | |

Plaintiffs Scurich Brothers, Inc. (SBI), Mark Scurich, and Bill Scurich (collectively, plaintiffs), sued a number of defendants in connection with two real estate transactions.  In the first transaction, SBI purchased three residential lots (lots transaction) and received a repurchase addendum from the seller agreeing to repurchase the lots after one year (repurchase addendum).  In the second transaction, SBI purchased assignments of fractional interests in six deeds of trust for six residential lots (deed of trust assignments transaction).

The case involved several defendants, only a fraction of whom have appealed. Plaintiffs bought the lots from defendant MJM Real Estate Investments, LLC (MJM). The repurchase addendum was signed by defendant Mark Frederickson.  Frederickson also arranged the deed of trust assignments transaction.  The deeds of trust were assigned to SBI from defendant Edinburgh Development Group, Ltd. (Edinburgh).  Those deeds of trust secured promissory notes issued to Edinburgh by defendant MidValley Ventures I, LLC (MidValley LLC).  Defendant CalStar Industries, Inc. (CalStar) was the majority

shareholder of MidValley LLC, and defendant MidValley Framing, Inc. (MidValley Framing) was the minority shareholder of MidValley LLC. Defendant Wayne Moles was the chief financial officer of both Edinburgh and CalStar.

On the causes of action concerning the lots transaction, the trial court granted rescission and awarded plaintiffs compensatory damages, attorney's fees, and costs against Frederickson and MJM. Regarding the deed of trust assignments transaction, the trial court found Frederickson, MJM, Edinburgh, MidValley LLC, and CalStar liable for fraud and awarded plaintiffs compensatory and punitive damages.[1] The trial court also found Frederickson liable for breach of fiduciary duty (in connection with the deed of trust assignments transaction) and breach of an implied covenant (in connection with the lots transaction), and awarded compensatory damages for each.

This appeal was filed by defendants Frederickson, MJM, Moles, and CalStar, but the opening brief concedes that MJM is a suspended limited liability corporation and therefore is not a party to the appeal. Frederickson, Moles, and CalStar claim the trial court erred as matter of law when it determined that: (1) Frederickson was the alter ego of MJM; (2) plaintiffs had standing; (3) plaintiffs were entitled to rescission of the lots transaction; (4) Frederickson breached the repurchase addendum; (5) Frederickson breached the implied covenant that the lots would be conveyed free of encumbrances; (6) Frederickson and Moles committed fraud related to the deed of trust assignments transaction; (7) Frederickson breached his fiduciary duty to plaintiffs related to the deed of trust assignments transaction; (8) the benefit-of-the-bargain measure of damages applied to Frederickson's breach of fiduciary duty; and (9) plaintiffs were entitled to punitive damages from Frederickson. For the reasons stated here, we will reverse the judgment because rescission was not an available remedy for the lots transaction and

---

[1] Default was entered against MidValley LLC.

plaintiffs did not suffer additional damages from Frederickson's breach of the implied covenant.

## I.  TRIAL COURT PROCEEDINGS

### A. TRIAL EVIDENCE

Brothers Bill and Mark Scurich began investing with Frederickson in 2003, when Frederickson was the president of Sterling Pacific, which was apparently a private investment company.  Between 2003 and 2005, the Scurich brothers were satisfied with their investments with Frederickson and Sterling Pacific.  In late 2005, Frederickson informed the Scurich brothers that he was selling Sterling Pacific and had selected them among a small group of Sterling Pacific's clients with whom he wanted to maintain a professional relationship.  Frederickson's principal place of business was in Monterey County.

### 1.  The Lots Transaction and Repurchase Addendum

In early 2006, Frederickson approached the Scurich brothers with an investment opportunity to buy residential lots in Chowchilla, informing them that a developer was planning to build "multi-million-dollar" homes on the lots.  Frederickson told Mark Scurich it was "a heck of a good deal" because prices would continue to climb over time. Based on these representations, on February 12, 2006 the brothers purchased three lots in Block 10 of the Greenhills Estates & Golf Club subdivision through their corporation SBI from Frederickson's limited liability corporation MJM for $978,440.44.  When Mark Scurich expressed concern that the lots might not appreciate in value according to Frederickson's expectations, Frederickson drafted and signed the repurchase addendum on February 13, 2006.  It stated that MJM "agrees to repurchase" the lots "if buyer so chooses after Feb. 15, 2007 for [the] original purchase price plus 12% interest" and that SBI "will market these lots through Cal Star and [MJM] during the one-year period." SBI later transferred the lots to Rubus, a general partnership consisting of Mark Scurich and Bill Scurich.

3

One of the lots, Lot 8, was encumbered by a deed of trust held by A.J. Louis Corporation securing a construction lien with a principal balance of $121,555. On a Seller's Estimated Closing Statement signed by Frederickson the day before he sold the lots, $121,000 as a payoff to "A.J. Lewis [*sic*]" is subtracted from the $315,000 purchase price paid by SBI for Lot 8. However, the final settlement statement for that transaction omitted the A.J. Louis lien. North American Title Company, who acted as the escrow agent in the lots transaction, paid off the A.J. Louis lien in 2008.

Within "a month or two" after February 2007, Mark Scurich asked Frederickson to honor the repurchase addendum. Plaintiffs then sent a formal letter to Frederickson and MJM in October 2007 demanding performance. Plaintiffs ultimately sued MJM and Frederickson for breach of the repurchase addendum, seeking specific performance of the agreement. Plaintiffs' second amended complaint (hereafter, Complaint) also alleged MJM and Frederickson breached the implied covenant that Lot 8 was conveyed free of encumbrances. Plaintiffs did not plead a cause of action for violation of the Subdivided Lands Act (Bus. & Prof. Code, § 11000 et seq.).

## 2. Deed of Trust Assignments Transaction

Edinburgh held nine promissory notes secured by deeds of trust on nine residential lots in Block 13 of the Greenhills Estates & Golf Club subdivision. The face value of each note was $85,500, representing money Edinburgh lent to MidValley LLC in January 2006. The notes would mature in January 2007. MidValley LLC was owned by two entities: a majority shareholder CalStar (of which Wayne Moles was Chief Financial Officer) and a minority shareholder MidValley Framing. The deeds of trust for the nine notes were all second in priority, behind deeds of trust securing notes for over $550,000 per property. In November 2006, MidValley Framing made an offer to be released from liability as a member of MidValley LLC. CalStar's 2006 statement of income from its 50 percent interest in MidValley LLC showed a loss of $5,576, suggesting that MidValley LLC's total loss was $11,152.

4

In late December 2006, Larry Pistoresi and Wayne Moles (the president and chief financial officer, respectively, of Edinburgh) approached Frederickson regarding an investment opportunity.[2] Edinburgh offered to assign the deeds of trust for the nine promissory notes to Frederickson at a discount in order to provide a tax benefit to Edinburgh. Pistoresi and Frederickson agreed that Edinburgh would assign 95.90643 percent interests in the deeds of trust for a total of $370,000 (approximately $41,111 per deed of trust assignment). Edinburgh would retain the remaining 4.09357 percent interest in each deed of trust.

Armed with that information, Frederickson called Bill Scurich. Bill testified to the following. Frederickson told him his colleagues Moles and Pistoresi "had some lots that they needed to sell by the end of the year ... [due to] tax implications." Frederickson claimed these lots were a short-term purchase from Edinburgh and that Edinburgh would repurchase them in 60 to 90 days for $82,500 each. Frederickson told him the lots were about $52,166 each, Bill Scurich agreed to buy six of the nine lots as SBI, and SBI gave Frederickson a check for $313,000.[3] Bill Scurich believed the prices for these Block 13 lots were lower than the Block 10 lots he had purchased earlier in the year because the lots on Block 13 were smaller, unlike the Block 10 lots that were "the cream of the crop" in the subdivision. Frederickson had also told him that during the early years of the subdivision, buyers had purchased lots for as little as $12,000.

Frederickson finalized the deal with Pistoresi (who consulted with Moles) and MJM paid Edinburgh $370,000 ($41,111 per deed of trust assignment), with the intention that MJM would take three deed of trust assignments and SBI would take the other six. Two documents were recorded to memorialize the nine deed of trust assignments. One,

---

[2] Pistoresi was not named as a defendant. He testified under subpoena for plaintiffs at trial.

[3] On direct examination, Bill Scurich testified that Frederickson told him the lots were "52.5, or thereabouts," and later testified on cross-examination that the lots were "52,100 and whatever." $313,000 divided by six is $52,167.

between Edinburgh and SBI, listed the lot numbers and Assessor's Parcel Numbers for the six deed of trust assignments but transferred one "undivided 95.90643% interest ($82,000)" in "that certain Deed of Trust dated January 19, 2006 ... recorded as instrument no. 2006003825" in January 2006. That instrument number corresponds with the deed of trust between MidValley LLC and Edinburgh for one of the six Block 13 lots. As a result of this incongruous drafting, title reports prepared for the lots showed the deed of trust assignment to SBI for one lot but did not show assignments of the deeds of trust for the other five lots.[4] The second document, between Edinburgh and MJM, similarly referred to one deed of trust, but listed three lots.[5] Both documents were signed by Pistoresi and Moles on behalf of Edinburgh and listed MJM's business address as the mailing address for the assignments once they were recorded.

In August 2007, new deed of trust assignments were drafted in order to properly convey property interests in all nine lots secured by the deeds of trust.[6] Those assignments transferred a 95.90643 percent interest in each deed of trust to SBI, "[t]ogether with the note or notes therein described or referred to" in the original deeds of trust, which were the promissory notes issued by MidValley LLC to Edinburgh in January 2006. That same month, Frederickson's wife purchased Lot 48 in Block 13 and Frederickson sent an e-mail to Pistoresi and Moles directing them to pay off the SBI deed of trust assignment encumbering that property and to use any excess funds toward paying off another deed of trust assignment. The excess funds amounted to $11,219.03, which were paid to plaintiffs for part of the money owed on another deed of trust assignment

---

[4] Plaintiffs received a copy of the deed of trust assignment from Frederickson in February 2007.

[5] Frederickson later reassigned MJM's deed of trust assignments to a woman named Maria Vargas to satisfy a personal debt to her.

[6] Plaintiffs received copies of their six new deed of trust assignments at some point, but Bill Scurich testified that he could not remember precisely when they received them.

they had purchased. In September 2007, the senior lienholders for the Block 13 lots associated with plaintiffs' remaining deed of trust assignments sent notices of default for each lot and the lots were later sold at a trustee's sale to satisfy those senior liens. Plaintiffs sent a letter to MidValley LLC demanding that it pay SBI for the five remaining deed of trust assignments (which as a result of the trustee's sale were no longer secured by real property). MidValley LLC did not pay plaintiffs any money in response to the demand letter.

Relating to the deed of trust assignments, the Complaint alleged causes of action for breach of contract against MidValley LLC, CalStar, and MidValley Framing; fraud in the inducement against Frederickson, MJM, Moles, and Edinburgh; conspiracy to commit fraud against Frederickson, MJM, Edinburgh, Moles, MidValley LLC, MidValley Framing, and CalStar; breach of fiduciary duty against Frederickson; and negligence and negligence per se against Frederickson and MJM.

## B. AMENDED STATEMENT OF DECISION

In an amended statement of decision that the court based on plaintiffs' proposed statement of decision, the court found: MJM (and Frederickson as MJM's alter ego) violated "the Subdivision Map Act such that Rescission of the [lots transaction] is warranted";[7] MJM (and Frederickson as MJM's alter ego) breached the repurchase addendum; CalStar (as the alter ego of MidValley LLC) breached its obligation to pay promissory notes secured by the deed of trust assignments; Frederickson, MJM, Moles, and Edinburgh defrauded plaintiffs in the deed of trust assignments transaction; Frederickson, MJM, Edinburgh, Moles, and CalStar conspired to defraud plaintiffs in the deed of trust assignments transaction; Frederickson breached his fiduciary duty to

---

[7] As we will discuss in greater detail in Part II.B.2, plaintiffs raised issues and offered expert testimony through Guy Puccio related to the Subdivided Lands Act (Bus. & Prof. Code, § 11000 et seq.), but appear to have confused that statutory scheme with the Subdivision Map Act (Gov. Code, § 66410 et seq.).

7

plaintiffs in the deed of trust assignments transaction; Frederickson and MJM committed negligence and negligence per se related to both transactions; and Frederickson and MJM breached the implied covenant that Lot 8 was conveyed free of encumbrances.

## C. PUNITIVE DAMAGES HEARING

At a hearing to determine the appropriateness and amount of punitive damages to impose against Frederickson for defrauding plaintiffs, plaintiffs elicited testimony from Frederickson, his former accountant, and Joshua Fischer (a member of the partnership that purchased Sterling Pacific from Frederickson around 2005). Among several assets identified, plaintiffs focused on three that they argued Frederickson had attempted to hide: a deposit for over $1 million owed to Frederickson for a villa in Anguilla; a promissory note and deed of trust for which Frederickson held a 50 percent beneficial interest related to the sale of Sterling Pacific that Frederickson caused to be assigned to his daughter in 2010 (worth approximately $245,000); and a trustee's deed depositing an interest in land into one of Frederickson's retirement accounts in October 2008 (worth over $400,000). Frederickson testified that he would probably not be able to recover the Anguilla deposit because the property was being foreclosed upon, but did not offer documentation about the foreclosure. Frederickson testified that his daughter bought the note from him, but did not present evidence that he received compensation for the assignment. Frederickson acknowledged during his testimony that he had not disclosed the retirement deposit during his deposition, stating that he thought plaintiff's counsel had been asking about *new* transfers whereas the retirement deposit was "transferred back" into the account after a debtor defaulted on a loan. Plaintiffs argued that Frederickson had refused to disclose evidence of his assets despite discovery requests, was hiding major assets from the court, and had the ability to pay punitive damages. Frederickson claimed he had a negative net worth.

The trial court was very direct in describing its dissatisfaction with Frederickson's testimony in the punitive damages phase of the case, stating that it was "very concerned"

8

about Frederickson's failure to disclose money deposited into a retirement account and that there were "huge, empty spaces" in Frederickson's testimony that "raise[] a serious question in the Court's mind about his veracity ... ." The court found "[b]oth his answers to questions in court and the failure to provide any documents in support of [his] position ... very troubling"; his testimony was "exceedingly unreliable"; and it was "striking how hard the defendant was working to not give reliable information." The trial court accepted plaintiffs' evaluation of Frederickson's assets and ordered $313,000 in punitive damages against him.

## D. JUDGMENT

The judgment (drafted by plaintiffs) awarded the following: (1) rescission of the lots transaction, along with $342,144.33 in compensatory damages, $38,303.63 in attorney's fees, and $7,000 in costs against Frederickson and MJM "due to failure to comply with [the] Subdivision Map Act"; (2) $127,677.76 against Frederickson and MJM for breach of the implied covenant for Lot 8; (3) $324,775.68 against Frederickson, MJM, CalStar, Moles, and Edinburgh jointly and severally for conspiracy to defraud plaintiffs related to the deed of trust assignments transaction; (4) $277,622.35 against Frederickson for breach of fiduciary duty in the deed of trust assignments transaction;[8] and (5) $313,000 in punitive damages against Frederickson and MJM for fraud in the deed of trust assignments transaction.

## II.    DISCUSSION

Preliminary issues affect the scope of review. It is settled that judgments are generally considered final against non-appealing parties (*Estate of McDill* (1975) 14 Cal.3d 831, 840), and suspended domestic corporations may not appeal from an

---

[8] The court found that plaintiffs were entitled to benefit-of-the-bargain damages for Frederickson's breach of fiduciary duty. The court calculated benefit-of-the-bargain damages as $602,398.03. Because the court had already found Frederickson liable for $324,775.68 in out-of-pocket damages for fraud, the court subtracted that amount from the full amount of benefit-of-the-bargain damages to reach $277,622.35.

9

adverse judgment. (*Gar-Lo, Inc. v. Prudential Sav. & Loan Assn.* (1974) 41 Cal.App.3d 242, 245.) As noted at the outset, the opening brief concedes that MJM is not a party to the appeal because it is a suspended limited liability corporation. However, the brief later attempts to assert issues related to MJM. Because MJM is a suspended LLC, our review is limited to claims related to Frederickson, Moles, and CalStar. We will address MJM's conduct only as necessary to determine Frederickson's alter ego liability for MJM's actions. The trial court's judgment is final as to all other defendants.

Plaintiffs argue that the opening brief did not fairly summarize the facts in the light most favorable to the judgment and requests that we deem forfeited all arguments related to the sufficiency of the evidence. (Citing *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) Trial court decisions are presumed correct and the appealing party has the burden to affirmatively show error. (*Santa Clara County Environmental Health Assn. v. County of Santa Clara* (1985) 173 Cal.App.3d 74, 83–84 (*Santa Clara County Env. Health*); *Lennane v. Franchise Tax Bd.* (1996) 51 Cal.App.4th 1180, 1189.) We will not furnish legal arguments for an appellant. (*Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 963.) Though the appealing defendants' briefs provide an improperly one-sided recitation of facts and essentially attempt to retry the case on appeal, we will nonetheless review arguments containing reasoned analysis.[9] Finally, when a defendant's liability is established by one of several alternative grounds, we need not consider all alternative grounds for the judgment. (*Sutter Health Uninsured Pricing Cases* (2009) 171 Cal.App.4th 495, 513 (*Sutter*).)

---

[9] Neither party's briefing was perfect. Our review was hampered by all of the parties' failures to cite the record to support factual assertions. When citations did occur, they did not comply with California Rules of Court, rule 8.204(a)(1)(C), which requires briefs to support record references by citation to both page *and* volume numbers.

## A. FREDERICKSON AS ALTER EGO OF MJM

Frederickson challenges the trial court's finding that he was the alter ego of MJM. The trial court found that Frederickson "used MJM funds as his own" and did not maintain corporate formalities. We review a trial court's application of the alter ego doctrine for substantial evidence. (*Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1072 (*Misik*).)

Generally, a corporation is regarded as a separate and distinct legal entity and its liabilities will not extend to its stockholders, officers, and directors. (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538 (*Sonora*); see also former Corp. Code, § 17101, subd. (a) [generally "no member of a limited liability company shall be personally liable ... for any debt, obligation, or liability of the limited liability company"], repealed by Stats. 2012, ch. 419, § 19, p. 3986.) The alter ego doctrine is an equitable exception to that general rule, allowing courts to find an individual member of the corporation liable if: (1) there is a sufficient unity of interest and ownership between the corporation and the individual controlling it that their separate personalities no longer exist; and (2) "treating the acts as those of the corporation alone will sanction a fraud, promote injustice, or cause an inequitable result." (*Misik*, *supra*, 197 Cal.App.4th at pp. 1071–1072; former Corp. Code, § 17101, subd. (b), repealed by Stats. 2012, ch. 419, § 19, p. 3986; see also Corp. Code, § 17703.04, subd. (b).) Factors supporting application of the alter ego doctrine include: commingling of funds and assets; one entity representing that it is liable for the debts of the other; identical equitable ownership of the entities; using the same offices and employees; using an entity as a " 'mere shell or conduit for the affairs of the other' "; inadequate capitalization; disregard of corporate formalities; and having identical directors and officers. (*Sonora,* at pp. 538–539, quoting *Roman Catholic Archbishop v. Superior Court* (1971) 15 Cal.App.3d 405, 411.)

Though the lots transaction was between MJM and SBI, the trial court found Frederickson liable as the alter ego of MJM. The court found that MJM was composed

11

of Frederickson and his wife and that Frederickson used MJM funds as his own throughout the transactions before the court. Frederickson argues there was no evidence to support the trial court's finding. To the contrary, plaintiffs offered evidence through the testimony of Ms. Vargas that Frederickson used property owned by MJM to satisfy a personal debt to her related to her investment of $380,000 with Frederickson for what she believed was a condominium in Lake Tahoe. Instead of the condominium, Frederickson assigned her three deeds of trust in Block 13 owned by MJM. Throughout her testimony, Vargas referred to Frederickson as an individual and her testimony suggested that the debt was personally owed by Frederickson, not MJM. Though Frederickson argues that plaintiffs did not submit any agreement between Vargas and Frederickson into evidence, absent evidence that Vargas's investment had actually been with MJM her testimony provides substantial evidence from which the trial court could find that Frederickson used MJM property to satisfy a personal debt. Further, Mark Scurich testified that Frederickson never specified that he was acting as MJM in the lots transaction and that "it was always just Mark Frederickson to me." That evidence also supports the trial court's finding of a "unity of interest" between Frederickson and MJM. (*Misik*, *supra*, 197 Cal.App.4th at pp. 1071–1072.)

As for the second prong, Frederickson makes no affirmative showing that the trial court erred in concluding that an inequitable result would follow unless it pierced the corporate veil. The court could reasonably conclude that it would be inequitable to allow Frederickson to conduct transactions seemingly as an individual and then hide behind the MJM corporate form upon plaintiffs' discovery of his wrongdoing. That inequity is particularly acute here as MJM is now a suspended corporation. Further, as we will discuss, substantial evidence supports the trial court's finding that Frederickson defrauded plaintiffs and breached his fiduciary duties to them. We find substantial evidence supports the trial court's conclusion that Frederickson is the alter ego of MJM.

12

### B. LOTS TRANSACTION

#### 1. Plaintiffs' Standing

Frederickson argues that plaintiffs lack standing to sue on the lots transaction because the Rubus general partnership, to which SBI transferred the lots, is not a named plaintiff. Civil actions "must be prosecuted in the name of the real party in interest." (Civ. Proc. Code, § 367.) The real party in interest is generally the person or entity possessing the right sued upon. (*Gantman v. United Pacific Ins. Co.* (1991) 232 Cal.App.3d 1560, 1566–1567.) The repurchase addendum for the lots is a contract between SBI and MJM, and there is no evidence SBI transferred or assigned its rights under the addendum to Rubus. SBI therefore has standing to directly enforce the repurchase addendum.

Plaintiffs' ability to sue for breach of contract or rescission in connection with the purchase of the lots is more complicated, but the result is the same. SBI transferred the lots to Rubus in August 2006. Mark and Bill Scurich were named as plaintiffs both individually and as general partners of Rubus. "Lawsuits to enforce partnership claims are generally only instituted in the name of the partnership, [citation], or by all of the individual partners in their capacity as partners by common law." (*Delbon Radiology v. Turlock Diagnostic Center* (1993) 839 F.Supp. 1388, 1391.) Plaintiffs are the sole partners of Rubus and sued in their capacity as general partners of that partnership. By including all of the partners of the Rubus general partnership in their capacities as general partners, plaintiffs satisfied Code of Civil Procedure section 367. Frederickson offers no reason for a contrary finding, nor does he suggest he suffered any prejudice from plaintiffs' pleading.

#### 2. The Trial Court Erred in Granting Rescission

Frederickson argues that rescission of the lots transaction was inappropriate because the Complaint neither alleged Subdivision Map Act (or Subdivided Lands Act) violations nor prayed for rescission as a remedy. It appears the trial court granted a

request to amend the Complaint to conform to proof that plaintiffs made in their written rebuttal statement. A trial court may grant a request to amend a pleading to conform to proof offered at trial. (Civ. Proc. Code, § 473, subd. (a)(1).) We review a trial court's decision to amend a pleading for abuse of discretion. (*Thompson Pacific Const., Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 545.)

### a. Procedural Background

As Frederickson notes, the Complaint did not reference the Subdivision Map Act or rescission. The first mention of rescission we find in the record is a passing reference during plaintiffs' opening statement, where counsel stated "if you violate the Subdivision Map Act, and you don't do a Public Report, and you sell in disregard of that, it's a transaction that's rescindable." Plaintiffs' expert witness Guy Puccio testified that what he referred to as the "Subdivided Lands Law" requires sellers to provide various disclosures about subdivided property in a public report. The trial court admitted public reports for Block 10 and Block 13 into evidence.

In plaintiffs' written closing argument, they urged that Frederickson's failure to provide plaintiffs with a public report during the lots transaction violated the Subdivided Lands Act (Bus. & Prof. Code, § 11000 et seq.), which forbids selling land in a subdivision "without first obtaining a public report from the Real Estate Commissioner." (Bus. & Prof. Code, § 11018.2.) Plaintiffs claimed the remedy for that violation was to void the lots transaction and "award rescission." Frederickson argued in his written closing argument that rescission was not available because it had not been pleaded. Plaintiffs responded in rebuttal that their Subdivided Lands Act arguments were within the scope of the Complaint and, to the extent not properly pleaded, requested that the court amend the Complaint to conform to proof. The trial court granted plaintiffs' "request for rescission" but did not mention a statutory basis in its ruling. Plaintiffs filed a proposed statement of decision, which stated "Frederickson and MJM failed to comply with the *Subdivision Map Act*" and granted rescission of the lots transaction. (Italics

14

added.)  That Subdivision Map Act reference was repeated verbatim in both the court's initial and amended statements of decision.  The judgment, drafted by plaintiffs, also referenced the Subdivision Map Act.

### b.  Analysis

Based on the evidence presented at trial, it appears that plaintiffs meant to allege violations of the Subdivided Lands Act, which mandates disclosure of information by subdividers to prospective purchasers of homes via documents called public reports.  (See *Barrett v. Hammer Builders, Inc.* (1961) 195 Cal.App.2d 305, 308 ["The legislative purpose is to protect individual members of the public who purchase lots or homes from subdividers and to make sure that full information will be given to all purchasers concerning public utility facilities and other essential facts with reference to the land."].)  However, plaintiffs instead referred to the Subdivision Map Act (Gov. Code, § 66410 et seq.), which is an entirely different statutory scheme regulating subdivision approvals and land use planning by local governments.  (See, e.g., Gov. Code, § 66411 ["Regulation and control of the design and improvement of subdivisions are vested in the legislative bodies of local agencies."].)

The parties' briefs on appeal suggest they believe either that the court based its decision solely on the Subdivision Map Act or that the Subdivided Lands Act and Subdivision Map Act refer to the same statutory scheme.  The opening brief restates its objection to plaintiffs' failure to plead rescission or the Subdivision Map Act and argues prejudice for not being allowed to assert exceptions to the Subdivision Map Act in the trial court.  (Citing Gov. Code, § 66499.35, subd. (a).)  Respondent's brief is similarly confused, referring to the Subdivision Map Act in relation to the disclosure requirements of the Subdivided Lands Act, but also occasionally correctly referring to the Subdivided Lands Act.  Plaintiffs quote *Sixells, LLC v. Cannery Business Park* (2008) 170 Cal.App.4th 648, 655, to support their argument that the trial court properly voided

15

the lots transaction, even though that case involves the Subdivision Map Act and not the Subdivided Lands Act.

We requested supplemental briefing to clarify whether plaintiffs meant to allege violations of the Subdivided Lands Act rather than the Subdivision Map Act. In their supplemental brief, plaintiffs state that they presented evidence related to *both* the Subdivision Map Act *and* the Subdivided Lands Act at trial. But there is no support for plaintiffs' claim that they alleged or argued violations of the Subdivision Map Act. Plaintiffs do not cite an applicable section of the Subdivision Map Act to inform this court what violations they might have been asserting. Though they point to Guy Puccio's references to the Subdivision Map Act at trial, those were merely passing references to that statute in the context of his detailed discussion of the information disclosure requirements of the Subdivided Lands Act. As for the Subdivided Lands Act, plaintiffs claim their failure to cite that statute in their proposed statement of decision and thereafter was "simply an omission" and argue we should disregard the court's reference to the Subdivision Map Act because the court's decision was correct in law. (Citing *D'Amico v. Board Of Medical Examiners* (1974) 11 Cal.3d 1, 18–19 (*D'Amico*).)

Plaintiffs also argue the court did not err in granting their request to amend to conform to proof because defendants had notice of their claims. The appealing defendants note in their supplemental brief that a reviewing court will not affirm a trial court's decision on a different ground "when the ' "new theory was not supported by the record made at the first hearing and would have necessitated the taking of considerably more evidence." ' " (Quoting *People v. Brown* (2004) 33 Cal.4th 892, 901; see also *ibid.* [noting principle of affirmance on a different ground does not apply when " 'the defendant had no notice of the new theory and thus no opportunity to present evidence in opposition' "].)

While plaintiffs did present some evidence at trial related to the Subdivided Lands Act—namely Guy Puccio's testimony and a brief discussion in their written closing

16

argument—we find that Frederickson did not have adequate notice and opportunity to respond to issues related to the Subdivided Lands Act because plaintiffs: failed to allege Subdivided Lands Act violations (or request rescission) in the Complaint; repeatedly referred to the wrong statutory scheme throughout trial; and failed to reference the correct statute in the proposed statement of decision after the trial court apparently granted plaintiffs' informal request to amend. Absent notice and an opportunity to present evidence in opposition, the trial court abused its discretion when it allowed the pleading to be amended in that fashion. (Code Civ. Proc., § 473, subd. (a)(1); see *Weinberg v. Dayton Storage Co.* (1942) 50 Cal.App.2d 750, 759 ["amendments of pleadings to conform to the proofs should not be allowed when they raise new issues not included in the original pleadings and upon which the adverse party had no opportunity to defend"].)

Because the trial court improperly granted leave to amend, its decision to rescind the lots transaction and award $342,144.33 in compensatory damages related to that rescission cannot stand. The Complaint neither alleged violations of the Subdivided Lands Act nor prayed for rescission. As plaintiffs did not amend to allege Subdivided Lands Act violations at a time that would have given defendants adequate notice and an opportunity to defend, and because plaintiff did not provide any other legal basis for rescission, the court erred in granting that remedy. We also reverse the attorney's fees award because it was apparently likewise based on plaintiffs' Subdivided Lands Act argument. Although we find that plaintiffs were not entitled to rescission of the lots transaction, as discussed next they are entitled to damages related to the lots transaction based on the trial court's finding that Frederickson and MJM breached the repurchase addendum.

### 3. The Trial Court Did Not Err in Concluding that Frederickson Breached the Repurchase Addendum

Frederickson argues that he did not breach the repurchase addendum because plaintiffs sought to exercise their option after a deadline he contends was specified in the

17

repurchase addendum. The February 2006 repurchase addendum states that MJM "agrees to repurchase" the lots "if [SBI] so chooses after Feb. 15, 2007" for the original purchase price plus 12 percent interest. It required SBI to market the lots "through Cal Star and MJM Real Estate during the one-year period."

Parol evidence is admissible to interpret a contract when its terms are ambiguous. (*Roden v. Bergen Brunswig Corp*. (2003) 107 Cal.App.4th 620, 624.) Though a contract may appear clear on its face, it is latently ambiguous if parol evidence shows that the contract is reasonably susceptible of two or more interpretations. (*Bill Signs Trucking, LLC v. Signs Family Limited Partnership* (2007) 157 Cal.App.4th 1515, 1521.) Whether a contract is ambiguous is a question of law we review de novo. If a contract is ambiguous and parol evidence is not in conflict, interpretation of the contract is also reviewed de novo. However, if there is conflicting parol evidence, we uphold the trial court's interpretation if it is supported by substantial evidence. (*Ibid.*) We also review a trial court's determination that a party breached a contract for substantial evidence. (*Saks v. Charity Mission Baptist Church* (2001) 90 Cal.App.4th 1116, 1132.)

Frederickson argues "it is clear from the evidence that plaintiffs were required to exercise the option, if at all, at the one year time limit referenced in the repurchase agreement," while plaintiffs contend the trial court properly decided that the agreement did not have a time limit and that Frederickson breached the agreement when he refused to repurchase the lots. Though the repurchase addendum appears clear on its face, parol evidence in the form of trial testimony from plaintiffs and Frederickson show it is reasonably susceptible of each party's interpretation. Frederickson testified that "[o]ur intent was one year" and that plaintiffs' formal request in October 2007 was too late because it came "almost two years after" he signed the repurchase addendum. Mark Scurich testified that Frederickson told him if the lots did not sell within a year, Frederickson would repurchase them. He further testified that plaintiffs asked Frederickson to honor the agreement and repurchase the lots within "a month or two"

18

after February 2007. Plaintiffs formally demanded that Frederickson honor the repurchase addendum by letter in October 2007.

Faced with conflicting testimonial evidence, the court determined that MJM (and Frederickson as MJM's alter ego) breached the repurchase addendum. The court could reasonably find that the February 15, 2007 date referred to the time period during which CalStar and MJM had the exclusive right to market the property and that it did not create an option that both matured and expired on the same day. By finding that MJM and Frederickson breached the repurchase addendum, the court impliedly rejected Frederickson's testimony that plaintiffs had to exercise their option on February 15, 2007. The court apparently found plaintiffs' testimony more credible than Frederickson's. We will not disturb the trial court's credibility determinations on appeal. (*People v. Maury* (2003) 30 Cal.4th 342, 403 ["[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends."].) Substantial evidence supports the trial court's rejection of Frederickson's interpretation of the repurchase addendum. Because Frederickson never repurchased the lots, substantial evidence also supports the trial court's finding that MJM and Frederickson breached the repurchase addendum.

Though we have determined that rescission was an inappropriate remedy, plaintiffs are entitled to one of two alternative remedies on remand, based on the remedies plaintiffs requested in their Complaint: money damages or specific performance. As "the breach of an agreement to purchase an estate in real property," Frederickson's breach of the repurchase addendum entitles plaintiffs to "the excess, if any, of the amount which would have been due to the seller under the contract over the value of the property to him or her, consequential damages according to proof, and interest." (Civ. Code, § 3307.)[10] Alternatively, the court has discretion to require

_____

[10] Unspecified statutory references are to the Civil Code.

19

specific performance of the repurchase addendum, meaning that Frederickson would receive the lots from plaintiffs in return for plaintiffs' purchase price ($978,440.44) plus 12 percent interest, as well as any pre- and post-judgment interest to which plaintiffs may be entitled. (§§ 3384, 3386, 3287–3289.) We express no opinion regarding which of those remedies is more appropriate here, leaving that decision to the trial court on remand.

### 4. The Trial Court Did Not Err in Concluding that Frederickson Breached an Implied Covenant Regarding Lot 8; However the Award of Damages was Improper

Frederickson argues the trial court erred in finding that MJM (and Frederickson as MJM's alter ego) breached the implied covenant in the grant deed for Lot 8 that the property was being transferred free of encumbrances by failing to pay off an existing lien held by A.J. Louis Corporation. Frederickson contends on appeal that he did not know that lien encumbered Lot 8.[11] Section 1113 describes covenants that are implied "[f]rom the use of the word 'grant' in any conveyance by which an estate of ... fee simple is to be passed ... ." One of those covenants is that "such estate is at the time of the execution of such conveyance free from encumbrances done, made, or suffered by the grantor, or any person claiming under him." (§§ 1113, subd. (2); 1114 ["The term 'incumbrances' includes taxes, assessments, and all liens upon real property."].) As the trial court's resolution of this issue involved application of section 1113 to the facts, we review for substantial evidence. (See *Haworth v. Superior Court* (2010) 50 Cal.4th 372, 384 [noting substantial evidence standard applies to application of law to facts].)

Frederickson argues on appeal that he did not know the A.J. Louis lien encumbered Lot 8 when MJM transferred Lot 8 to SBI via grant deed, citing his trial

---

[11] The amended statement of decision erroneously states that the lien at issue was held by "VoulaFX, Inc.," due to plaintiffs' reference to the wrong information in its proposed statement of decision. However, defendants acknowledge that the relevant lien was held by A.J. Louis Corporation.

20

testimony to that effect. However, Frederickson omits other evidence that directly controverts his testimony, including the "Seller's Estimated Settlement Statement," dated February 12, 2006 and signed by Frederickson. That statement lists various expected debits and credits related to the Lot 8 transaction. It subtracts $121,000 associated with payoff charges to "A.J. Lewis [*sic*]" from the $315,000 purchase price credit expected from plaintiffs. Frederickson also replied "Yes" when asked at trial: "As of the date of February 12th, 2006, did you understand that Mr. Louis should be paid $121,000?" Frederickson later testified he learned that the title company had paid off the lien and confirmed that he never reimbursed the title company. The foregoing provides substantial evidence to support the trial court's finding that Frederickson knew of the lien on the property, and that by failing to pay the lien out of the proceeds from the Lot 8 sale he breached the implied covenant that Lot 8 was conveyed free of encumbrances.

Though substantial evidence supports Frederickson's liability for breach, the record does not support the trial court's award of $127,677.76 in damages for that breach. The title company paid A.J. Louis to satisfy the lien. Plaintiffs did not provide evidence showing that they suffered any injury. Plaintiffs argue the collateral source rule—which allows a plaintiff to recover from a tortfeasor even when the plaintiff received compensation for an injury from a third party—applies and makes the title company's payment irrelevant. (Citing *Chanda v. Federal Home Loans Corp.* (2013) 215 Cal.App.4th 746, 752.) However, plaintiffs concede in their supplemental brief that the collateral source rule generally applies only in tort cases. (*Plut v. Fireman's Fund Ins. Co.* (2000) 85 Cal.App.4th 98, 107 ["[T]he overwhelming weight of authority in California and other jurisdictions has rejected the extension of the collateral source rule to breach of contract."]; see also *Bramalea California, Inc. v. Reliable Interiors, Inc.* (2004) 119 Cal.App.4th 468, 472 ["But the collateral source rule applies to tort damages, not to damages for breach of contract."].) A lawsuit for breach of the implied covenant that a grant of fee simple is conveyed free of encumbrances sounds in contract rather than

21

tort.  (See *William Ede Co. v. Heywood* (1908) 153 Cal. 615, 617 ["[T]he right of the grantee to reimbursement from the grantor and his heirs for money necessarily paid by him to discharge encumbrances so covenanted against [by section 1113] thus rests on the terms of his contract."].)

Plaintiffs request that we apply the collateral source rule to affirm the trial court's decision, arguing that Frederickson will receive a windfall by not having to pay off the lien and that the title company will be denied reimbursement.  However, plaintiffs' failure either to show damages they incurred or to join the title company as a plaintiff in the suit precludes the trial court's damages award related to breach of the implied covenant.  (See *American Title Co. v. Anderson* (1975) 52 Cal.App.3d 255, 259–260 [subrogation action by title company against grantor related to section 1113 action against grantor by grantee].)

## C. DEED OF TRUST ASSIGNMENTS TRANSACTION

### 1. The Trial Court Did Not Err in Concluding that Frederickson Breached his Fiduciary Duty and Defrauded Plaintiffs

Frederickson argues that he acted as a principal rather than as plaintiffs' broker or agent in the deed of trust assignments transaction and therefore owed no fiduciary duty to them.  He further contends that plaintiffs did not prove fraud, and incorrectly claims they had to do so by clear and convincing evidence.[12]  The trial court found Frederickson liable for breach of fiduciary duty (in his role as a real estate broker for plaintiffs) and fraud related to the deed of trust assignments.[13]  As these causes of action were based on similar facts, we address them together.  We review the court's fraud and breach of

_____

[12]  Section 3295, cited by Frederickson, does not discuss standards of proof.  To the extent Frederickson meant to cite section 3294, that section sets out the showing necessary for punitive damages, not the tort of fraud.  (§ 3294, subd. (a).)

[13]  On appeal, the parties make breach of fiduciary duty arguments related to both the lots transaction and the deed of trust assignments transaction.  Because the trial court focused its breach of fiduciary duty decision on the deed of trust assignments transaction, we do not address claims related to the lots transaction.

22

fiduciary duty findings for substantial evidence. (*Warren v. Merrill* (2006) 143 Cal.App.4th 96, 109–110 (*Warren*).)

### a. Frederickson as De Facto Broker

A real estate broker subject to mandatory licensing by the state is "a person who, for a compensation or in expectation of a compensation, regardless of the form or time of payment, does or negotiates to do one or more of the following acts for another or others: [¶] ... [¶] (d) Solicits borrowers or lenders for or negotiates loans or collects payments or performs services for borrowers or lenders or note owners in connection with loans secured directly or collaterally by liens on real property or on a business opportunity." (Bus. & Prof. Code, §§ 10131, subd. (d); 10130 [requiring real estate broker's license to "engage in the business of, act in the capacity of, advertise as, or assume to act as a real estate broker"].) An individual acting as a real estate broker owes his or her principal an obligation of undivided service and loyalty equal to that imposed on trustees in favor of their beneficiaries. (*Warren*, *supra*, 143 Cal.App.4th at p. 109.) That obligation includes the duty to disclose all material facts about the transaction that might affect the principal's decision. (*Roberts v. Lomato* (2003) 112 Cal.App.4th 1553, 1563 (*Roberts*).) A real estate broker does not cease to be his or her principal's fiduciary when the broker also enters the transaction as a principal in his or her own right. (*Id.* at p. 1566.)

To prove Frederickson was a broker, plaintiffs had to show that he solicited, negotiated, or otherwise performed services for plaintiffs related to the deed of trust assignments and did so for compensation or in expectation of compensation. Bill Scurich testified that Frederickson called him in December 2006, offering plaintiffs a "proposed investment" to purchase lots from Edinburgh (through Pistoresi and Moles). Frederickson told Bill Scurich that it was a short-term transaction; in return for investing around $52,166 per lot, plaintiffs would receive $82,500 per lot in 60 to 90 days. Based on Frederickson's representations, plaintiffs paid Frederickson $313,000.

On the other side of the transaction, Pistoresi approached Frederickson and offered him nine deed of trust assignments at a discount. Although the face value of each deed of trust was $85,500 ($769,500 total), Pistoresi offered to assign a 95.90643 percent interest in each deed of trust for $41,111 each ($370,000 total). Frederickson retained three deed of trust assignments and plaintiffs were meant to receive the other six deed of trust assignments. Throughout the transaction, Pistoresi negotiated solely with Frederickson and received the $370,000 purchase price directly from MJM.

The foregoing provides overwhelming evidence to support the trial court's finding that Frederickson was a de facto broker because he solicited and negotiated the deed of trust assignments for plaintiffs and received compensation by taking $313,000 from plaintiffs for six deed of trust assignments even though Edinburgh only charged him $246,666 for those six. In light of that evidence, Frederickson's claims that "no actions [were] undertaken on behalf of" plaintiffs and that he was not compensated border on frivolous.

### b. Fraud by Frederickson and Breach of Fiduciary Duty

A real estate broker (or unlicensed de facto broker) is liable for actual fraud through the tort of deceit if the broker knowingly misrepresents a material fact to a principal, with intent to deceive the principal, and the principal detrimentally relies on the misrepresentation. (*Warren*, *supra,* 143 Cal.App.4th at p. 110; §§ 1709 ["One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."]; 1710, subd. (1) [deceit includes the "suggestion, as a fact, of that which is not true, by one who does not believe it to be true"].) Alternatively, constructive fraud occurs when a broker, even "without an actually fraudulent intent," breaches the fiduciary duty owed to a principal by gaining an advantage by misleading the principal to his or her prejudice. (§ 1573; *Warren,* at p. 109.)

24

Bill Scurich testified that Frederickson offered to sell plaintiffs six lots for $313,000 from Edinburgh. However, the transaction was actually for assignments of fractional interests in six second-priority deeds of trust related to six lots in Block 13. Though sold by Edinburgh, these deed of trust assignments were for notes issued by MidValley LLC, an entity about which plaintiffs knew nothing. Facts regarding the type of property interest (fee title versus a subordinated trust deed) and the price for that interest are certainly material facts that Frederickson had a duty to disclose. Frederickson's failure to disclose the true terms of the transaction as well as his affirmative misrepresentations constituted material misrepresentations.

As plaintiffs' de facto broker who negotiated the transaction with Edinburgh, Frederickson knew that the transaction involved deed of trust assignments rather than fee simple grant deeds and that Edinburgh sought $246,666 for the six deed of trust assignments ($41,111 per assignment times six assignments), not $313,000. Rather than send the deed of trust assignments to plaintiffs after recordation, which Bill Scurich testified had been their common practice in previous transactions, Frederickson had the deed of trust assignments mailed to his address and did not provide plaintiffs a copy until two months after the transaction. Based on that evidence, the court could infer that Frederickson intended to deceive plaintiffs into investing so that he could earn $66,334 (the difference between $313,000 and $246,666), and sought to delay their discovery of his fraud by having the deed of trust assignments mailed to his office.

Plaintiffs detrimentally relied on Frederickson's misrepresentations. They paid for what they believed were six lot deeds, received only partial deed of trust assignments, and paid substantially more than Edinburgh's asking price for the assignments. Further, foreclosure by the senior lienholder eliminated the real property security for the deed of trust assignments, a result which could not have occurred had plaintiffs received fee simple deeds as promised. The importance of the type of property interest received was stressed by Bill Scurich, who testified that he would not have invested had he known the

25

investment involved deed of trust assignments. The foregoing provides substantial evidence to support the trial court's finding that Frederickson defrauded plaintiffs and intentionally breached his fiduciary duty to them by withholding and misrepresenting material facts.

Frederickson's arguments against the trial court's findings are unpersuasive. He argues it was "unreasonable as a matter of law" for plaintiffs to think they were receiving fee title to six lots for a total of $313,000 when they had spent almost $1 million earlier that year for three lots. But Bill Scurich offered a reasonable explanation for his belief, testifying that Frederickson told him that during the early years of the development investors purchased lots for as little as $12,000. Bill also testified that he believed, "based on what [he] understood from Mr. Frederickson," that the Block 10 lots plaintiffs had purchased in the lots transaction were more expensive because they were the "the cream of the crop" in the subdivision, whereas the Block 13 lots were much smaller. Frederickson also points to an e-mail with the subject "note purchase" that he claimed to have sent to Bill Scurich on December 27, 2006 informing him they were "good to go on the note purchase" and instructing him where to transfer $313,000 to MJM. But Bill Scurich testified that he never received the e-mail and that he sent the money in response to a telephone call he received from Frederickson on December 27, 2006. On all of these issues, the trial court heard conflicting evidence and found plaintiffs' testimony more credible. Such credibility determinations are the province of the trial court to which we defer on appeal. (*Maury*, *supra*, 30 Cal.4th at p. 403.)

Because substantial evidence supports the trial court's fraud and breach of fiduciary duty findings, we do not reach the alternative bases for liability against Frederickson regarding the deed of trust assignments transaction (namely, negligence and negligence per se). (*Sutter*, *supra*, 171 Cal.App.4th at p. 513 ["[O]ne good reason is sufficient to sustain the order from which the appeal was taken."].)

26

## 2. Fraud by Wayne Moles[14] Based on Withholding Material Facts

Moles argues that the trial court erred in finding him individually liable for defrauding plaintiffs in the deed of trust assignments transaction in his role as an officer of Edinburgh.[15]  (Citing *Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 508.)  Moles's argument that he could not be found liable for fraud because he "did not engage in any conversations with plaintiffs" misses the point.  As noted in the amended statement of decision, in addition to affirmative representations, liability for fraud attaches to the "suppression of a fact, by one who is bound to disclose it" (§ 1710, subd. (3)), when that suppression is used to induce a person to purchase realty.  (*Alfaro v. Community Housing Improvement System & Planning Assn., Inc.* (2009) 171 Cal.App.4th 1356, 1382–1383 (*Alfaro*).)  A duty to disclose arises when one party to a transaction has exclusive knowledge of, or access to, material facts not reasonably discoverable by the other party.  (*Goodman v. Kennedy* (1976) 18 Cal.3d 335, 347.)  In transactions involving real property, material facts include those affecting the value or desirability of the property.  (*Alfaro*, at p. 1382.)  Whether the seller knew about the suppressed facts and whether those facts were material are both questions of fact subject to substantial evidence review.  (*Shapiro v. Sutherland* (1998) 64 Cal.App.4th 1534, 1544.)

Regarding Moles's duty to disclose material facts not reasonably discoverable by plaintiffs, the trial court found that Moles, as the CFO of both Edinburgh (the lender to

---

[14]  The opening brief's heading refers to fraud claims against both CalStar and Wayne Moles, but that section focuses on Moles without directly challenging the court's findings regarding CalStar.  Because error must be affirmatively shown and CalStar did not satisfy that burden, we do not reach the trial court's finding of liability against CalStar.  (*Santa Clara County Env. Health, supra,* 173 Cal.App.3d at pp. 83–84.)

[15]  The trial court found Moles individually liable and imposed damages jointly and severally among Moles, CalStar, and the other defendants.  Because Moles would not owe a greater amount of money as the alter ego of CalStar, we do not reach his arguments regarding whether he was the alter ego of CalStar.

MidValley LLC and assignor to SBI) and CalStar (the majority member of borrower MidValley LLC), had insider knowledge of material facts not reasonably discoverable by plaintiffs. The court found that Moles knew MidValley LLC was in a "precarious" financial position, that the other member of MidValley LLC (MidValley Framing) had sought to leave MidValley LLC "to avoid liability," and that the deed of trust assignments were "risk capital" because MidValley LLC needed to complete residences to pay off the notes but could not complete those homes before the notes matured.

Moles testified that in November 2006 MidValley Framing made an offer to be released from liability as a member of MidValley LLC. Regarding MidValley LLC's financial position, plaintiffs relied on CalStar's 2006 financial statement regarding its 50 percent share of MidValley LLC's profits and losses, which showed no net annual income for MidValley LLC and a loss of $5,576 for CalStar. Moles did not discuss MidValley LLC's assets in the trial court, instead arguing in the fraud section of his closing trial brief that all facts related to the transaction were reasonably discoverable.

On appeal, Moles now claims MidValley LLC had $10 million in assets, citing the first page of a MidValley LLC balance sheet. However, to the extent the trial court was even presented with that argument, it found plaintiffs' evidence more credible, likely because the second page of that balance sheet discloses that while MidValley LLC had over $10 million in assets, it also had over $10 million in liabilities, leading to $8,667.46 in total equity in December 2006. The trial court also discredited Moles's testimony that he did not know plaintiffs were purchasing the deed of trust assignments, citing "documents prepared and discussed by Edinburgh, Moles, and Frederickson" that showed plaintiffs were the purchasers, including the deed of trust assignment itself, which Moles signed on behalf of Edinburgh. Substantial evidence therefore supports the trial court's conclusion that Moles had a duty to disclose these material facts to plaintiffs.

We are also not persuaded by Moles's argument that he cannot be held liable for fraud because he "did not engage in any conversations with plaintiffs ... ." Given his duty

28

to disclose material facts, his admitted failure to talk to plaintiffs is completely consistent with the court's finding that he breached his duty. Insider information about MidValley LLC's financial difficulties was not reasonably discoverable by plaintiffs, especially because they believed they were conducting a transaction with Edinburgh. By failing to disclose the material information that MidValley LLC did not have sufficient assets to repay the notes secured by the deeds of trust that were partially assigned to plaintiffs (let alone the larger first position deeds of trust), Moles induced plaintiffs to invest. Plaintiffs were damaged by Moles's concealment when the holder of the first-position deeds of trust foreclosed on the properties, extinguishing the property interests securing the promissory notes Edinburgh assigned to plaintiffs. Substantial evidence therefore supports the trial court's finding that Moles defrauded plaintiffs.

### 3. Damages for Breach of Fiduciary Duty Based on Fraud

Frederickson argues the trial court improperly awarded benefit-of-the-bargain damages[16] for his breach of fiduciary duty, arguing he was only responsible for plaintiffs' out-of-pocket losses.[17] Plaintiffs do not address Frederickson's argument about the measure of damages for the deed of trust assignments transaction, confining their discussion of benefit-of-the-bargain damages to the lots transaction.

Determination of the proper measure of damages is a question of law we review de novo, while the trial court's calculation of the amount of damages awarded is reviewed for substantial evidence. (*Rony v. Costa* (2012) 210 Cal.App.4th 746, 753.) Further, " 'a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable

---

[16] Benefit-of-the-bargain damages are intended "insofar as possible to place [the plaintiff] in the same position he would have been in" had the bargain been as promised. (*Coughlin v. Blair* (1953) 41 Cal.2d 587, 603.)

[17] An out-of-pocket measure of damages "awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received." (*Stout v. Turney* (1978) 22 Cal.3d 718, 725 (*Stout*).)

to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' " (*D'Amico*, *supra*, 11 Cal.3d at p. 19.)

The trial court found Frederickson liable for $602,398.03 in damages for his breach of fiduciary duty related to the deed of trust assignments transaction and characterized those as benefit-of-the-bargain damages.[18] (Citing *Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226 (*Alliance*).) Because Frederickson's liability for breach of fiduciary duty was based on his intentional misrepresentations to plaintiffs, the trial court effectively awarded plaintiffs $602,398.03 against Frederickson for his fraud in the deed of trust assignments transaction.

Section 3343, subdivision (a) provides that "[o]ne defrauded in the purchase, sale or exchange of property is entitled to recover the difference between the actual value of that with which the defrauded person parted and the actual value of that which he received ... ." That language sets forth an out-of-pocket measure of damages. (*Stout*, *supra*, 22 Cal.3d at p. 725.) But section 3343 also describes additional damages that may be recovered, including lost profits. A defrauded party is entitled to recover "any loss of profits or other gains which were reasonably anticipated and would have been earned by him from the use or sale of the property had it possessed the characteristics fraudulently attributed to it by the party committing the fraud," so long as "all of the following apply: [¶] (i) The defrauded party acquired the property for the purpose of using or reselling it for a profit. [¶] (ii) The defrauded party reasonably relied on the fraud in entering into the transaction and in anticipating profits from the subsequent use or sale of the property. [¶] (iii) Any loss of profits for which damages are sought under this

---

[18] The judgment stated that Frederickson was personally liable for $277,622.35 for breach of fiduciary duty but explains that amount "is the difference between the 'benefit of the bargain' damages of $602,398.03 awardable under plaintiff's [*sic*] claim of breach of fiduciary duty against Mark Frederickson, personally, and the out of pocket damages of $324,775.68 awarded against all defendants under the above 'conspiracy to commit fraud' claim."

paragraph have been proximately caused by the fraud and the defrauded party's reliance on it." (§ 3343, subd. (a)(4).)

Here, in the amended statement of decision the trial court found that "Frederickson and MJM solicited Plaintiffs to invest money with Edinburgh" to buy "what was supposed to have been six parcels" and that "Frederickson promised that Plaintiffs' money, plus a return on investment, would be repaid to Plaintiffs within 90 days." Those statements support a finding that plaintiffs acquired the deed of trust assignments "for the purpose of using or reselling [them] for a profit." (§ 3343, subd. (a)(4)(i).) The trial court also found that "Frederickson told Plaintiffs that the purchase was a 'heck of a good buy' " and determined that plaintiffs' "reliance on the misrepresentations by Frederickson ... was reasonable in that Frederickson convinced plaintiffs that he was running the same investment services through MJM that he had previously [run] through Sterling Pacific Lending, Inc., ... with whom plaintiffs had a history of successful investments." Those statements support a finding that plaintiffs' reliance on Frederickson's fraud "in entering into the transaction and in anticipating profits from the subsequent use or sale of the property" was reasonable. (§ 3343, subd. (a)(4)(ii).) Though the trial court's amended statement of decision did not expressly find that the "loss of profits for which damages are sought under this paragraph have been proximately caused by the fraud and the defrauded party's reliance on it" (§ 3343, subd. (a)(4)(iii)), the court's award of the face value of each note—which is essentially the same amount as plaintiffs testified they were promised as profits—was necessarily an implicit finding by the trial court that plaintiffs' lost profits were proximately caused by Frederickson's fraud.[19]

Such a finding entitled plaintiffs to their lost profits under section 3343, subdivision (a)(4). Plaintiffs were awarded $602,398.03, based on the face value of

---

[19] Bill Scurich testified that Frederickson promised plaintiffs would receive $82,500 for each lot but the trial court used the face value of each note ($82,000).

31

plaintiffs' fractional interest in the notes ($82,000 per note), less a partial pay-off of $98,475.99 made to plaintiffs in August 2007, plus added interest. Bill Scurich testified that Frederickson promised him $82,500 per lot, which would be the starting point for a lost profits calculation and would lead to a slightly larger recovery. Significantly, however, plaintiffs do not challenge the adequacy of the damages awarded. Because the trial court's award of $602,398.03 in damages was " 'correct in law' " as an award of lost profits under section 3343, subdivision (a)(4), " 'it must be sustained regardless of the considerations which may have moved the trial court to its conclusion.' "[20] (*D'Amico*, *supra*, 11 Cal.3d at p. 19.)

Frederickson relies on *Kenly v. Ukegawa* (1993) 16 Cal.App.4th 49 (*Kenly*) to argue that he was not liable for plaintiffs' lost profits under section 3343, subdivision (a)(4). In *Kenly*, the defendant (Ukegawa) owned a farm that was encumbered by several liens including a first trust deed securing a promissory note (Puckett note). Facing a pending foreclosure sale related to the Puckett note, Ukegawa approached the plaintiff (Kenly) and promised that if Kenly "acquired the Puckett note he would profit handsomely from a later purchase and resale of the farm." (*Id.* at p. 51–52, 55.) In reality, "Ukegawa had no intention of performing his promise to sell, but only made such promise to induce Kenly to advance the funds necessary to stave off the impending foreclosure." (*Id.* at p. 52.) Kenly purchased the Puckett note and later sued Ukegawa when he learned that Ukegawa was trying to sell the farm to someone else. The trial court found that Ukegawa had defrauded Kenly and awarded damages

---

[20] Because the trial court's award can be sustained as an award of lost profits, we do not consider whether plaintiffs were also entitled to those damages by virtue of Frederickson's intentional fraud as a fiduciary. (See *Alliance, supra,* 10 Cal.4th at pp. 1240–1241, 1250 [stating "the 'broader' measure of damages provided by sections 1709 and 3333 applies" to intentional fraud by a fiduciary but concluding that "[w]hile the measure of damages under section 3333 might be greater for a fiduciary's *intentional* misrepresentation, we need not address that issue here"], italics in original.)

"representing the lost profits Kenly would have obtained had Ukegawa honored the agreement to sell the [farm] property to him." (*Ibid.*)

The Court of Appeal in *Kenly* reversed the award of lost profits. (*Kenly*, *supra*, 16 Cal.App.4th at p. 53.) The *Kenly* court explained that lost profits are recoverable under section 3343, subdivision (a)(4) "when a buyer of property is induced by fraudulent representations of the seller concerning the nature of the property." (*Ibid.*) But the court concluded that section 3343, subdivision (a)(4) did not apply because the lost profits Kenly claimed were "expected from the resale of a piece of property (i.e., the farm) *never acquired* by the defrauded party." (*Id*. at pp. 53–54, original italics.) The court reasoned that section 3343 "clearly contemplates that the party actually *acquire* the property *in question,* i.e., the property from which profits were to be realized" and that because Kenly never obtained the property from which he expected profits, he was not entitled to lost profits. (*Id.* at p. 55, original italics.)

*Kenly* is factually distinguishable. The plaintiff in *Kenly* knew about two different pieces of property (the Puckett note and the farm) and knowingly purchased the Puckett note with the belief that he would then be able to purchase the farm and profit from reselling the farm. By contrast, in this case the trial court found that plaintiffs were told they were buying six fee simple deeds that would then be resold back to Edinburgh for a profit. Though the property plaintiffs actually acquired turned out to be the deed of trust assignments, plaintiffs acquired the only "property in question" they were aware of and were thus entitled to "any loss of profits or other gains which were reasonably anticipated and would have been earned by [them] from the use or sale of the property had it possessed the characteristics fraudulently attributed to it by" Frederickson.[21] (§ 3343, subd. (a)(4).)

_____

[21] *Simon v. San Paolo U.S. Holding Co., Inc.* (2005) 35 Cal.4th 1159 (*Simon*), which cited *Kenly* with approval in a different context, is likewise factually

33

#### 4. The Trial Court Properly Awarded Punitive Damages

Frederickson contends that plaintiffs were not entitled to punitive damages because they did not prove Frederickson's fraud by clear and convincing evidence and that, even assuming plaintiffs were entitled to damages, the trial court's award was excessive. (Citing § 3294.) The trial court awarded $313,000 in punitive damages against Frederickson and MJM for fraud in the deed of trust assignments transaction after receiving evidence and holding a separate hearing.

##### a. Plaintiffs Demonstrated Entitlement to Punitive Damages

Section 3294, subdivision (a) states: "In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant." Fraud under section 3294 "means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." (§ 3294, subd. (c)(3).) In imposing punitive damages, the trial court found that plaintiffs established Frederickson's fraud by clear and convincing evidence, which requires a showing in the trial court that is of sufficient clarity to leave no substantial doubt. (*In re Angelia P.* (1981) 28 Cal.3d 908, 919.) We review the trial court's finding for substantial evidence. (*Crail v. Blakely* (1973) 8 Cal.3d 744, 750.)

Contrary to Frederickson's claim on appeal that the trial court found him liable for only constructive fraud, the court found Frederickson liable for actual fraud regarding the deed of trust assignments transaction. The court found that Frederickson intentionally misrepresented both the nature of the investment (claiming plaintiffs were buying lots when the investment was actually for assignments of second-position deeds of trust) and

---

distinguishable because the plaintiff in *Simon* never acquired the property from which he claimed lost profits. (*Id*. at pp. 1168–1170.)

the price of the investment (claiming Edinburgh sought $52,500 per deed of trust assignment instead of the actual price of $41,111). The record contains abundant support for the trial court's conclusion that plaintiffs proved those intentional misrepresentations by clear and convincing evidence, including testimony by Bill Scurich and Larry Pistoresi as well as documentary evidence showing the price Edinburgh actually charged for the deed of trust assignments. Substantial evidence thus supports the trial court's finding that plaintiffs were entitled to punitive damages against Frederickson.

### b. The Punitive Damages Award Was Not Excessive

Frederickson contends that the $313,000 punitive damages award is excessive because his net worth was "non-existent" as of the March 2011 punitive damages hearing, and because plaintiffs produced no evidence of his net worth at the time of trial.[22] Section 3294, subdivision (a), authorizes imposition of punitive damages "for the sake of example and by way of punishing the defendant." When reviewing a claim that the amount of punitive damages is excessive under state law, we must "determine whether the award is excessive as a matter of law or raises a presumption that it is the product of passion or prejudice." (*Adams v. Murakami* (1991) 54 Cal.3d 105, 109–110.) Our Supreme Court has identified the following criteria to guide our review: the reprehensibility of the misconduct; comparison of the punitive damages award to the amount of compensatory damages awarded; and the wealth of the defendant. (*Neal v. Farmer's Ins. Exchange* (1978) 21 Cal.3d 910, 928 (*Neal*).) We do not re-weigh the evidence or resolve issues of credibility, as those powers are vested in the trial court. (See *Schroeder v. Auto Driveaway Co.* (1974) 11 Cal.3d 908, 918–919 [finding that the

---

[22] Though the topic heading in Frederickson's opening brief states that the punitive damages award was "constitutionally excessive," he offers no argument regarding the constitutional issue, i.e., whether the punitive damages award was so excessive as to violate due process. (See *Simon, supra,* 35 Cal.4th at p. 1172.) As Frederickson did not provide reasoned analysis supporting a claim of federal constitutional error, we do not address the due process issue. (*Santa Clara County Env. Health*, *supra*, 173 Cal.App.3d at p. 83–84.)

defendants failed to challenge excessiveness of punitive damages in the lower court; noting that review of the amount of damages should occur first in the trial court because "the trial court is vested with the power, denied to us, to weigh the evidence and resolve issues of credibility"].)

Frederickson argues that the punitive damages award was excessive as a matter of law because plaintiffs did not provide evidence of Frederickson's wealth at the time of trial adequate to rebut his showing that his net worth was non-existent. But plaintiffs argued that they were unable to provide current financial information for Frederickson because he refused provide information in response to discovery requests. By accepting plaintiffs' evaluation of Frederickson's assets, the trial court implicitly accepted plaintiffs' argument. Further, plaintiffs presented evidence of over $1.5 million in assets that plaintiffs argued Frederickson was attempting to hide (the Anguilla property deposit, the promissory note Frederickson caused to be assigned to his daughter, and assets in a retirement account). Though Frederickson argued that those assets should not be factored into his net worth for various reasons, the trial court deemed his testimony "exceedingly unreliable" and was troubled by "[b]oth his answers to questions in court and the failure to provide any documents in support of [his] position ... ."

As for the reprehensibility of Frederickson's conduct and the relationship between the punitive damages award and the amount of compensatory damages awarded (*Neal*, *supra*, 21 Cal.3d at p. 928), neither criterion supports a finding that the punitive damages award was excessive as a matter of law. Frederickson took advantage of a position of trust in the deed of trust assignments transaction and profited from his intentional misrepresentations to plaintiffs. And the punitive damages award is equal to plaintiffs' investment in the deed of trust assignments transaction, which was the starting point for the trial court's compensatory damages calculation. On this record, Frederickson has failed to show that the trial court's $313,000 punitive damages award was excessive as a matter of law. (*Neal,* at p. 928.)

36

### III.    DISPOSITION

The judgment is reversed and the matter is remanded with instructions to strike: (1) $324,144.33 in compensatory damages and $38,303.63 in attorney's fees related to rescission of the repurchase addendum; and (2) $127,677.76 in damages related to Frederickson's breach of the implied covenant related to Lot 8.  On remand, the trial court shall determine the remedy to be awarded for Frederickson's breach of the repurchase addendum, either:  monetary damages in the amount of "the excess, if any, of the amount which would have been due to the seller under the contract over the value of the property to him or her, consequential damages according to proof, and interest" (Civ. Code, § 3307); or specific performance of the repurchase addendum if the trial court finds that the remedy provided by Civil Code section 3307 is inadequate (Civ. Code, § 3384).  Each party shall bear its own costs on appeal.

_____

Grover, J.

**WE CONCUR:**

_____

Bamattre-Manoukian, Acting P.J.

_____

Mihara, J.

*Scurich Brothers, Inc. et al. v. Mark Frederickson et al.*
**H038675**